1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PAUL GERARD FICK,

11           Plaintiff,                    No. 2:11-cv-00905-KJN

12        v.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,

14

15           Defendant.                   ORDER AND ORDER TO SHOW CAUSE
     _____/

16           Plaintiff seeks judicial review of a final decision of the Commissioner of Social

17   Security ("Commissioner") denying plaintiff's application for Supplemental Security Income

18   ("SSI") under Title XVI of the Social Security Act ("Act").[1]  In his motion for summary

19   judgment, plaintiff principally contends that the Commissioner erred by finding that plaintiff was

20   not disabled from July 19, 2007 (the date of his SSI application), through the date of the final

21   administrative decision.  (Dkt. No. 17.)  The Commissioner filed an opposition to plaintiff's

22   motion, which is also construed as a cross-motion for summary judgment.  (Dkt. No. 18.)

23   Plaintiff filed a reply brief.  (Dkt. No. 19.)  For the reasons that follow, the court denies

24   _____

25        [1]  This case was referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15) and 28
     U.S.C. § 636(c), and both parties voluntarily consented to proceed before a United States
26   Magistrate Judge.  (Dkt. Nos. 7, 11.)

1  plaintiff's motion for summary judgment, grants the Commissioner's cross-motion for summary

2  judgment, enters judgment for the Commissioner, and issues an order to show cause as set forth

3  below.

4  I.      BACKGROUND

5              Plaintiff was born on March 9, 1963, has at least a high school education, and

6  previously worked as an auto mechanic, ranch hand, driver, landfill laborer, and dishwasher.[2]

7  (Administrative Transcript ("AT") 28, 44, 182, 194.)  On July 19, 2007, plaintiff applied for SSI,

8  alleging that he was unable to work as of April 23, 2005[3] due to a "back injury."  (AT 20, 72,

9  175-76.)  On January 17, 2008, the Commissioner determined that plaintiff was not disabled.

10  (AT 20, 77-81.)  Upon plaintiff's request for reconsideration, the determination was affirmed on

11  May 9, 2008.  (AT 20, 84-88.)  Subsequently, plaintiff requested a hearing before an

12  administrative law judge ("ALJ"), which took place on September 14, 2009.  (AT 20, 35.)  At the

13  hearing, plaintiff was represented by attorney Richard Grogan, and Susan Clavel, an impartial

14  vocational expert ("VE"), provided expert testimony.  (AT 35, 39, 64.)

15              In a decision dated November 19, 2009, the ALJ determined that plaintiff had not

16  been under a disability, as defined in the Act, since July 19, 2007, the date that his SSI

17  application was filed.  (AT 20-30.)  The ALJ's decision became the final decision of the

18  Commissioner when the Appeals Council denied plaintiff's request for review on February 16,

19  2011.  (AT 1-5.)  Subsequently, plaintiff filed this action in federal district court on April 4,

20

21        [2]  Because the parties are familiar with the factual background of this case, including
   plaintiff's medical history, the court does not exhaustively relate those facts here.  The facts
22  related to plaintiff's impairments and medical history will be addressed insofar as they are
   relevant to the issues presented by the parties' respective motions.
23
        [3]  Although the ALJ considered plaintiff's complete medical history, the ALJ correctly
24  observed that SSI benefits are not payable prior to the month following the month in which the
   application was filed.  See 20 C.F.R. § 416.335.  (AT 20.)  Thus, the relevant period during
25  which plaintiff must establish a disability under the Act is from the date of his SSI application
   through the date of the Commissioner's final decision, a finding which plaintiff does not dispute
26  in his briefing to this court.

2

1   2011, to obtain judicial review of the Commissioner's final decision.  (Dkt. No. 1.)

2   II.   ISSUES PRESENTED

3            The court initially observes that review of alleged error by the ALJ was

4   significantly complicated by plaintiff's counsel's poor briefing, which also failed to comply with

5   the undersigned's April 6, 2011 scheduling order.  That order outlined detailed briefing

6   requirements, including "a summary of relevant medical evidence," a "short, separate statement

7   of each of plaintiff's legal claims stated in terms of the insufficiency of the evidence to support a

8   particular finding of fact or reliance upon an erroneous legal standard," and "argument separately

9   addressing each claimed error."  (Dkt. No. 5 at 3, ¶ 6.)  The order further cautioned that failure to

10  abide by these requirements "may lead to the imposition of sanctions, including striking of the

11  motion or opposition, or striking of the complaint or answer."  (Id.)  Not only did plaintiff's

12  counsel not provide a summary of the medical evidence, but as will be discussed below, he also

13  mischaracterized some of the pertinent treatment reports.  Furthermore, no "short, separate

14  statement of each of plaintiff's legal claims" was provided, and the issues raised were scattered

15  in a hodgepodge fashion throughout plaintiff's briefing, instead of being addressed in a logical,

16  argument-by-argument basis.

17           Even though the court could strike plaintiff's motion, the court is cognizant that

18  Social Security claimants already face long waiting times for resolution of their cases and that

19  plaintiff's case should not be prejudiced by his counsel's poor briefing and failure to comply with

20  the court's order.  Therefore, the court instead elects to issue an order to show cause why

21  monetary sanctions should not be imposed against plaintiff's counsel (as discussed further

22  below) and proceeds to consideration of plaintiff's arguments.

23           Plaintiff raised the following issues: (1) whether the ALJ failed to properly

24  evaluate the medical evidence concerning plaintiff's physical impairments; (2) whether the ALJ

25  failed to properly analyze the evidence concerning plaintiff's alleged mental impairments; and

26  (3) whether the ALJ improperly discounted plaintiff's testimony regarding his symptoms and

1  functional limitations.

2  III.    LEGAL STANDARD

3          The court reviews the Commissioner's decision to determine whether (1) it is

4  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

5  the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).

6  Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v.

7  Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

8  as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d

9  625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The

10  ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

11  resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations

12  omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

13  than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

14  IV.    DISCUSSION

15          A.    Summary of the ALJ's Findings

16          The ALJ evaluated plaintiff's entitlement to SSI pursuant to the Commissioner's

17  standard five-step analytical framework.[4]  At the first step, the ALJ concluded that plaintiff had

18

19          [4] Disability Insurance Benefits are paid to disabled persons who have contributed to the
Social Security program. 42 U.S.C. §§ 401 et seq.  Supplemental Security Income is paid to
20  disabled persons with low income. 42 U.S.C. §§ 1382 et seq. Both provisions define disability,
in part, as an "inability to engage in any substantial gainful activity" due to "a medically
21  determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).
A parallel five-step sequential evaluation governs eligibility for benefits under both programs.
22  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S.
137, 140-42, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
23
                Step one:  Is the claimant engaging in substantial gainful
24      activity?  If so, the claimant is found not disabled.  If not, proceed
        to step two.
25              Step two:  Does the claimant have a "severe" impairment?
        If so, proceed to step three.  If not, then a finding of not disabled is
26      appropriate.

not engaged in substantial gainful activity since July 19, 2007, plaintiff's application date.  (AT 22.)  At step two, the ALJ determined that plaintiff had the following severe impairments: chronic back pain, hypertension, and diabetes mellitus II.  (AT 22.)  However, at step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AT 22.)

Before proceeding to step four, the ALJ assessed plaintiff's residual functional capacity ("RFC") as follows:

> [T]he claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 416.967(b).  Specifically, he can lift/carry, push/pull 20 pounds occasionally and 10 pounds frequently.  He can sit eight hours in an eight hour workday and stand/walk six hours in an eight hour workday with normal breaks.  He can stand 30-45 minutes with change of position.  He is precluded from ladder, rope and scaffolds.  Occasional stooping, crawling, crouching and kneeling.  No work at unprotected heights or around dangerous machinery.

(AT 23.)

At step four, the ALJ found that plaintiff was unable to perform any past relevant work.  (AT 28.)  Finally, at step five, the ALJ noted that plaintiff was 44 years old on the date of his application for SSI, had at least a high school education, and was able to communicate in English.  (AT 28.)  He further concluded that transferability of job skills was not an issue,

---

> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).  The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

5

1   because plaintiff's past relevant work was unskilled.  (AT 28.)  The ALJ found that, upon

2   consideration of plaintiff's age, education, work experience, and residual functional capacity,

3   "there are jobs that exist in significant numbers in the national economy" that plaintiff could

4   perform.  (AT 28.)  The ALJ relied on the testimony of the VE, who testified that an individual

5   with plaintiff's RFC could perform the following representative occupations: (1) information

6   clerk, SVP 2, light exertion, with 9,000 jobs in California and 74,000 jobs in the United States;

7   (2) office helper, SVP 2, light exertion, with 20,000 jobs in California and 154,000 jobs in the

8   United States; and (3) mail clerk, SVP 2, light exertion, with 8,000 jobs in California and 82,000

9   jobs in the United States.  (AT 29, 65-69.)

10          Accordingly, the ALJ concluded that plaintiff had not been under a disability, as

11  defined in the Act, since July 19, 2007, the date of plaintiff's SSI application.  (AT 30.)

12      B.      Plaintiff's Substantive Challenges to the Commissioner's Determinations

13              1.      Whether the ALJ failed to properly evaluate the medical evidence

14                      concerning plaintiff's physical impairments

15          Plaintiff primarily contends that the ALJ erroneously failed to credit the opinions

16  of his treating providers and improperly relied on the assessments of a consultative examiner and

17  the non-examining state agency physicians in finding him not disabled.

18          The weight given to medical opinions depends in part on whether they are

19  proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

20  F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).

21  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

22  opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d

23  1273, 1285 (9th Cir. 1996).

24          To evaluate whether an ALJ properly rejected a medical opinion, in addition to

25  considering its source, the court considers whether (1) contradictory opinions are in the record;

26  and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a

6

1    treating or examining medical professional only for "clear and convincing" reasons.  Lester, 81

2    F.3d at 830-31.  In contrast, a contradicted opinion of a treating or examining professional may

3    be rejected for "specific and legitimate" reasons.  Lester, 81 F.3d at 830.  While a treating

4    professional's opinion generally is accorded superior weight, if it is contradicted by a supported

5    examining professional's opinion (supported by different independent clinical findings), the ALJ

6    may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

7    Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

8    weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[5] except that the ALJ

9    in any event need not give it any weight if it is conclusory and supported by minimal clinical

10   findings.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory,

11   minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a

12   non-examining professional, without other evidence, is insufficient to reject the opinion of a

13   treating or examining professional.  Lester, 81 F.3d at 831.

14          Before turning to plaintiff's specific contentions, a summary of the medical

15   evidence in this case is appropriate.  Plaintiff received most of his treatment from medical

16   professionals at the Veteran's Administration ("VA"), except for periods of incarceration when

17   he was treated by medical staff at the California Department of Corrections and Rehabilitation

18   ("CDCR").  A May 24, 2005 CDCR screening form showed hypertension and back problems.

19   (AT 238.)  At a CDCR physical examination on June 7, 2005, plaintiff was described as a

20   healthy 42 year old with a height of six feet, weight of 258 pounds, and hypertension, asthma,

21   and dermatitis.  (AT 236-37.)  On October 12, 2005, plaintiff denied any mental symptoms or

22   limitations, and was again assessed with hypertension, asthma, and dermatitis.  (AT 234-35.)  A

23   November 28, 2005 diagnostic study of plaintiff's lumbar spine showed moderate lower lumbar

24

---

25          [5]  The factors include: (1) length of the treatment relationship; (2) frequency of
     examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
26   (5) consistency; and (6) specialization.  20 C.F.R. § 404.1527.

1  degenerative changes, and a January 20, 2006 MRI of plaintiff's brain was normal.  (AT 241-42.)

2          Subsequently, on July 19, 2007, shortly after plaintiff's last release from prison,

3  plaintiff's primary care provider at the VA, Dr. Stephen E. Cox, advised plaintiff to lose

4  significant weight after having weighed in at 323 pounds.  (AT 249.)  He noted that plaintiff did

5  not get his previously ordered MRI and laboratory tests done.  (AT 249.)  Diagnostic testing of

6  the spine sacrum and coccyx done that same day showed mild degenerative changes with the soft

7  tissues appearing normal.  (AT 245.)  On August 22, 2007, plaintiff complained of disabling

8  back pain, which he attributed to a prior surgery for removal of a very large pilonidal cyst that

9  had been pressing on the spinal cord.  (AT 281.)  He informed Dr. Cox that the pain disabled him

10  from any of his previous skills or occupations, but simultaneously reported that his pain control

11  was satisfactory.  (AT 281-82.)  Plaintiff also stated that he was walking and dieting as best as he

12  could.  (AT 282.)  Dr. Cox noted plaintiff's difficulty in getting up from a chair and a marked

13  limitation in bending.  (AT 282.)  Dr. Cox diagnosed plaintiff with diabetes type II and

14  prescribed medication.  (AT 282.)  Although Dr. Cox advised plaintiff to stop smoking and

15  recommended referral to smoking cessation programs, plaintiff indicated that he did not want to

16  quit.  (AT 282.)  On November 7, 2007, plaintiff reported being on a diet and riding his bicycle.

17  (AT 281.)  He weighed in at 339 pounds, but Dr. Cox noted improved hyperglycemia.  (AT 281.)

18  Plaintiff stated that his economic circumstances were worse, and Dr. Cox indicated that he wrote

19  a letter regarding plaintiff's disability.  (AT 281.)[6]

20          On November 9, 2007, plaintiff was evaluated by VA clinical psychologist Dr.

21  Gregory H. Nelson based on Dr. Cox's provisional diagnosis of anxiety.  (AT 276-77, 280-81.)

22  Plaintiff stated that he was released from prison in June 2007 and on parole until 2010, that he

23  lived with his wife in a motel, that they rode bicycles wherever they needed to go, and denied

24  problems that would indicate mental health care.  (AT 277, 280.)  Dr. Nelson described plaintiff

25  _____

26          [6] No such letter appears in the record.

8

1   as a "large man, over wt, clean, casual in shorts and sport shirt, running shoes, on their bikes,

2   good eye contact, slightly fast spontaneous speech, serious mood, not depressed, approp affect,

3   coherent, oriented, restless sleep, good appetite, gained only 15 lbs since June 07, neg etoh >

4   1987, smokes 1-2 ppd, denied suicidal ideation." (AT 277, 280.)  Dr. Nelson provided no

5   diagnosis and a GAF score of 59.[7]  (AT 277, 280-81.)  Dr. Nelson suggested that plaintiff could

6   attend group counseling, which plaintiff declined, and then indicated that no follow-up was

7   necessary.  (AT 277, 281.)

8           Thereafter, on December 12, 2007, consultative examiner Dr. Joseph Garfinkel

9   reviewed plaintiff's prior medical records and performed a complete internal medicine

10  evaluation.  (AT 252-58.)  Plaintiff used a bicycle to get to the appointment.  (AT 252.)

11  Plaintiff's chief complaints were back pain, high blood pressure, and high blood sugar, and he

12  stated that his back pain started in 1982 when he had a large, grapefruit-sized pilonidal cyst

13  removed, which doctors informed him would eventually cause back problems and sciatica.  (AT

14  252.)  He reported that the pain mostly affected his lower back, radiated to both legs, and was

15  worse with sitting, walking, standing, bending, or stooping.  (AT 252.)  He noted that

16  medications helped to control the pain, but that it did not go away.  (AT 252.)  Plaintiff

17  mentioned that he used a cane at times, but Dr. Garfinkel stated that at the time of the

18  examination, he did not bring one and did not need one.  (AT 252.)

19          Upon physical examination, plaintiff weighed 334 pounds with a blood pressure

20  reading of 158/98, but had normal motor strength/tone, sensation, and reflexes.  (AT 254-55.)

21  Plaintiff had full range of motion in the upper and lower extremities, but complained of pain with

22  range of motion.  (AT 255.)  Plaintiff also reported lower back pain with straight leg raising at 30

23  _____

24      [7]   GAF is a scale reflecting "psychological, social, and occupational functioning on a
    hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental
    Disorders 34 (4th ed. 2000) ("DSM IV").  According to the DSM IV, a GAF of 51-60 indicates

25  "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR
    moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with

26  peers or co-workers)."  Id.

9

degrees left and 45 degrees right, but without spasm.  (AT 255.)  Plaintiff's range of motion in the back was 60 degrees with forward flexion, 10 degrees with lateral flexion, and 10 degrees with extension.  (AT 255.)  Dr. Garfinkel noted that plaintiff had an antalgic gait, but that he was able to stand and walk on his heels and toes.  (AT 256.)  He diagnosed plaintiff with chronic back pain, possibly osteoarthritis, possibly related to his prior pilonidal cyst; hypertension; and diabetes mellitus type II.  (AT 256.)  Dr. Garfinkel opined that plaintiff was capable of lifting or carrying 50 pounds occasionally and 25 pounds frequently; standing or walking for 6 hours in an 8-hour day; sitting for 6 hours in an 8-hour day; and suggested no postural, manipulative, visual, communicative, or environmental limitations.  (AT 256.)

On January 15, 2008, state agency physician Dr. Henry Crowhurst reviewed plaintiff's medical records, including the assessment by Dr. Garfinkel.  (AT 259-66.)  Dr. Crowhurst stated that plaintiff's diabetes was managed with medication, but that his hypertension was poorly controlled.  (AT 260.)  He doubted that the pilonidal cyst surgery was responsible for plaintiff's back pain, because although a pilonidal cyst itself might eventually cause back pain, he found no reason to believe that the cyst excision would produce lumbar pain or sciatica.  (Id.)  Dr. Crowhurst noted that plaintiff's decreased lumbar range of motion and antalgic gait may well be secondary to morbid obesity, especially because Dr. Garfinkel did not describe the gait.  (Id.)  He opined that due to plaintiff's morbid obesity, poorly controlled hypertension, chronic back pain and joint pain with motion, a lifting restriction of 20 pounds occasionally, 10 pounds frequently would be more appropriate.  (AT 260, 266.)

Subsequently, on February 15, 2008, plaintiff informed Dr. Cox that he got exercise by riding a bicycle, was on task with his diabetic control, and tolerated the medication.  (AT 279.)  Despite his weight of 333 pounds, Dr. Cox noted that plaintiff's diabetes was well controlled with blood pressure of 125/74.  (AT 279.)  Later that month, plaintiff told nurse practitioner Tiffany Lockhart that his pain related to his pilonidal cyst excision and scarring got significantly worse in 2003-2004, his legs and back were giving out, he had numbness in his legs

with burning, he was unable to lift, he was unable to sit for more than 2 minutes and stand for over 10 minutes, he could not lie on his back, and he was taking half a tablet of Vicodin every three hours to take the edge off, which was fatiguing.  (AT 278.)  Upon physical examination, Ms. Lockhart noted that the scar was very tender to palpation up to the lumbar spine, but that there was no underlying tissue loss, inflammation, or limitation of function.  (AT 278.)  She expressed doubt that plaintiff's symptoms were related to the pilonidal cyst excision, and opined that it was likely more a weight-related or mechanical back issue.  (AT 278.)  She recommended x-rays of the lumbar spine, but then noted that plaintiff did not get the x-rays as requested.  (AT 278-79.)

On April 16, 2008, Dr. Cox stated that plaintiff's diabetes was under good control, but that his obesity was the main problem with a weight of 340 pounds.  (AT 309.)  Dr. Cox noted that plaintiff did not make much progress with dieting and referred him to a dietician.  (AT 308-09.)  X-rays taken on April 17, 2008, showed minimal degenerative disease of the lower thoracic and lumbar spine.  (AT 299.)  On May 8, 2008, another state agency physician, Dr. Richard Dann, reviewed plaintiff's medical records and affirmed state agency physician Dr. Crowhurst's prior assessment.  (AT 283-84.)

On July 9, 2008, plaintiff's weight was 343 pounds, but he reported still doing a lot of bike riding, declined to quit smoking, and Dr. Cox assessed his diabetes and hypertension as stable and well controlled.  (AT 307.)  On August 13, 2008, plaintiff requested Dr. Cox to fill out a disability form.  (AT 306.)  Dr. Cox's treatment notes stated that plaintiff's back pain was the "biggest deterrent to employment followed closely by his morbid obesity," but there is no record of a completed disability form.  (AT 306.)  Dr. Cox again found that plaintiff had good diabetic control.  (AT 306.)  Plaintiff was next seen by Dr. Cox on November 18, 2008, having lost 12 pounds and reporting "no intercurrent problems" and good pain control with medication.  (AT 306.)  Dr. Cox assessed plaintiff's diabetes as stable and well controlled.  (AT 306.)

////

11

Thereafter, on February 9, 2009, plaintiff told Dr. Cox that his back was getting more painful, in particular the portion under the pilonidal cyst removal incision.  (AT 305.)  Dr. Cox found good diabetic and hypertension control, and referred plaintiff for a consultation with the general surgery clinic regarding his incision pain.  (AT 306.)  At a March 13, 2009 surgery consultation, staff general surgeon Dr. James Wiedeman noted that plaintiff's scar was painful to palpation, but described it as well healed with no skin breakdown, opening, or inflammation, and opined that any significant residual pilonidal disease was unlikely.  (AT 290, 302.)  Although plaintiff appeared uncomfortable sitting on the exam table, he was able to move all four extremities and his gait was noted to be normal.  (AT 292, 304.)  Dr. Wiedeman advised against surgery and opined that weight loss would significantly help if there was a mechanical problem in plaintiff's lower back.  (AT 290, 302.)  He also noted that taking 4 Vicodin a day was not really an excessive amount of pain medication, and suggested that plaintiff might potentially benefit from seeing a pain management specialist.  (AT 290, 302.)

After the surgical consultation, plaintiff returned to Dr. Cox on March 30, 2009, who stated that "no evidence was found that would give credence to the surgical scar for his back pain."  (AT 301.)  He did not refer plaintiff to a pain management specialist, but instead indicated that plaintiff's diabetes needed more treatment (based on increasing Acucheck levels) and that his "only significant job is wt loss," prescribing additional medication.  (AT 301.)  However, that same day nurse Linda Thaxton noted that she had educated plaintiff on available weight management programs, but that he declined treatment.  (AT 322.)  Plaintiff informed Ms. Thaxton that his pain control was satisfactory.  (AT 323.)  On April 28, 2009, plaintiff tested negative for depression.  (AT 321.)  That same day, plaintiff saw Dr. Cox and reported that his Vicodin works "very well," that his medication regimen successfully brought his Acucheck levels down, and that he was still "looking for work and a habitation."  (AT 320.)  Dr. Cox observed that his diabetes was under better control, but that his hypertension needed more attention, prescribing additional blood pressure medication.  (AT 320.)  Despite strong warnings

1  to quit smoking, plaintiff declined to do so.  (AT 320.)

2       On July 7, 2009, plaintiff told Dr. Cox that his Acuchecks remained within

3  normal limits.  (AT 318.)  On July 15, 2009, nurse Susan Cull noted that plaintiff had some

4  difficulty keeping his blood sugars stable and scheduled an education appointment.  (AT 318.)

5  During a July 23, 2009 opthalmic examination, plaintiff had generally good vision, no diabetic

6  retinopathy, but had mild cataracts and "possible glaucoma suspect versus ocular hypertension."

7  (AT 316-17.)  Some further testing was ordered, with a follow-up session contemplated in 4-6

8  months.  (AT 317.)  Finally, on August 5, 2009, plaintiff's weight was assessed as 331.3 pounds

9  with blood pressure of 134/76 and a pain level of 4.  (AT 315.)  Plaintiff informed Ms. Cull that

10  he tolerated his medications well, and she noted that his blood sugars were fairly well controlled.

11  (AT 313.)  She again advised plaintiff regarding diet and exercise, but indicated that he expressed

12  "a lot of excuses as to why he eats the way he does."  (AT 313.)  Plaintiff complained that he was

13  unable to exercise due to foot pain, and Ms. Cull encouraged him to ride his bicycle.  (AT 313.)

14  No further appointment was scheduled, and plaintiff was instructed to call if further help was

15  needed.  (AT 313.)

16       In light of the above, the court finds that substantial evidence supports the ALJ's

17  evaluation of the medical evidence concerning plaintiff's physical impairments.  As an initial

18  matter, although plaintiff devotes significant discussion to the deference due a treating

19  physician's opinion, the ALJ correctly noted that none of plaintiff's treating sources had defined

20  any specific limitations attributable to plaintiff's physical impairments.  (AT 25.)  Indeed, there is

21  no functional capacity assessment from any treating provider in the record.  (AT 27.)  The ALJ

22  carefully summarized the evidence from the treating sources and did not reject their clinical

23  findings or diagnoses.

24       Plaintiff references Dr. Cox's statement that plaintiff's back pain was the "biggest

25  deterrent to employment followed closely by his morbid obesity."  (AT 306.)  However, this

26  generalized statement is unaccompanied by any specific findings or assessed functional

1   limitations.  To the extent that Dr. Cox's statement can be construed as an opinion that plaintiff

2   is disabled, it is conclusory and minimally supported, and the ALJ was entitled to reject it on that

3   basis alone.  Meanel, 172 F.3d at 1114; Magallanes, 881 F.2d at 751.  Furthermore, "[a]lthough a

4   treating physician's opinion is generally afforded the greatest weight in disability cases, it is not

5   binding on an ALJ with respect to...the ultimate determination of disability."  Ukolov v.

6   Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005).

7           In his briefing, plaintiff's counsel also claims that the ALJ rejected nurse

8   practitioner Tiffany Lockhart's February 26, 2008 "opinion" that plaintiff was unable to sit for

9   more than 2 minutes and stand for over 10 minutes.  (See e.g. Pl's Mot. for Summary Judgment,

10  Dkt. No. 17 at 17-18, 23; Pl's Reply, Dkt. No. 19 at 9.)  However, this assertion grossly

11  misrepresents the record, because a careful review of Ms. Lockhart's notes reveals that the

12  referenced portion is merely plaintiff's subjective statement of his own symptoms and limitations

13  reported to Ms. Lockhart.  (AT 278.)  While Ms. Lockhart noted plaintiff's alleged limitations,

14  she did not endorse them or provide any other specific functional limitations in the diagnostic

15  portion of her notes.  (AT 278-79.)[8]

16          As the ALJ observed, plaintiff's treatment was "essentially routine and

17  conservative in nature."  (AT 26.)  With the exception of a few isolated instances, his diabetes

18  and blood pressure was well controlled with medication.  With respect to his back pain,

19  plaintiff's treating physicians opined that his complaints were unlikely to be the result of residual

20  pilonidal disease or the previous cyst excision, and the diagnostic studies showed only mild to

21  moderate degenerative changes in the lower back.  (AT 242, 245, 278, 290, 299, 301, 302.)

22  Although the medical records document some limitations in range of motion, discomfort, and

23

24          [8] Unfortunately, this is not the only misleading characterization of evidence in plaintiff's
    counsel's briefing.  For example, in a subheading, plaintiff's counsel contends that plaintiff's
    physicians "Uniformly Opined Based on Objective Medical Evidence That He Is Unable to Work
25  Due to his Chronic Back Pain, Hypertension and Diabetes Mellitus II."  (Pl's Mot. for Summary
    Judgment, Dkt. No. 17 at 10.)  As is evident from the summary of medical evidence above, this
26  contention is not only misleading, but also fictional.

1   pain with range of motion and straight leg raise testing, plaintiff also fairly consistently reported

2   that his pain was controlled satisfactorily with medication.  (AT 282, 306, 315, 320, 323.)  On

3   some occasions, plaintiff reported fatigue, sleepiness, drowsiness, and difficulty with

4   concentration associated with his medication, but at other times he claimed to tolerate his

5   medications well.  (AT 191, 215, 278, 279, 313, 320.)[9]  Significantly, plaintiff was not referred to

6   a pain management specialist, or referred for trigger point injections, acupuncture, or chiropractic

7   treatment, nor has he undergone recent surgery or hospitalization.  (AT 26.)  Thus, the court finds

8   that, taken as a whole, the evidence from plaintiff's treating providers supports the ALJ's

9   assessment of plaintiff's functional limitations.

10          Additionally, the ALJ justifiably relied on the functional capacity assessments of

11   consulting examiner Dr. Garfinkel and the state agency physicians.  Dr. Garfinkel reviewed

12   plaintiff's medical records, personally examined plaintiff, and made independent clinical

13   findings, and his opinion therefore constitutes substantial evidence.  Andrews, 53 F.3d at 1041

14   (citing Magallanes, 881 F.2d at 751).  Plaintiff argues that the ALJ failed to give proper weight to

15   Dr. Garfinkel's finding that plaintiff had an antalgic gait, but fails to explain why an antalgic gait

16   necessarily renders plaintiff disabled.  (AT 256.)  To the contrary, despite his finding that

17   plaintiff had an antalgic gait, Dr. Garfinkel opined that plaintiff could do medium level work, and

18   there is no opinion evidence supporting specific functional limitations resulting from plaintiff's

19   antalgic gait.  (Id.)

20          Furthermore, the opinions of the state agency physicians (Drs. Crowhurst and

21   Dann) also constitute substantial evidence, because they relied heavily on Dr. Garfinkel's

22   examination and medical records from plaintiff's treating sources, and their opinions are

23   _____

24          [9] In an August 1, 2007 function report, plaintiff indicated that he did not drive due to a
   suspended driver's license and due to medication.  (AT 189.)  However, at the hearing, plaintiff
25   presented a California driver's license (issued on March 4, 2009, expiring on March 9, 2014,
   with no restrictions), and testified that he last drove approximately two months prior to the
26   September 2009 hearing.  (AT 47-48.)

1   consistent with the record as a whole.  Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) ("the

2   findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as

3   other evidence in the record supports those findings").

4          Finally, plaintiff's argument that the ALJ failed to properly analyze the impact of

5   plaintiff's obesity is unpersuasive.  The ALJ acknowledged that the combined effects of

6   plaintiff's obesity and his other impairments may be greater than expected without obesity, but

7   also correctly observed that certain BMI levels do not necessary correlate with any specific

8   degree of functional loss.  See SSR 02-1p, at *2.  Based on plaintiff's morbid obesity, state

9   agency physician Dr. Crowhurst specifically recommended a more limited light RFC than the

10  consultative examiner's medium RFC, and the ALJ ultimately adopted the more restrictive light

11  RFC.  (AT 259-66.)  Plaintiff fails to point to record evidence of any additional functional

12  limitations attributable to his obesity that the ALJ failed to consider.  As discussed above,

13  plaintiff's diabetes and blood pressure were generally well controlled with medication.  The ALJ

14  also fairly accounted for plaintiff's increased back pain resulting from obesity by adopting Dr.

15  Crowhurst's light RFC, imposing postural restrictions, and imposing a limitation that plaintiff

16  could only stand for 30-45 minutes at a time with change of position.  (AT 23.)  Therefore, the

17  court finds that the impact of plaintiff's obesity was adequately considered by the ALJ in

18  formulating plaintiff's RFC.[10]

19  ////

20  ////

21

22          [10] In addition to challenging the ALJ's assessment of plaintiff's RFC, plaintiff contends,
    in conclusory fashion, that he "would have equaled the listings midway through the sequential
23  evaluation of his disability as his impairments equal the specific regulatory criteria for an
    irrebutable [sic] finding of disability."  (Pl's Mot. for Summary Judgment, Dkt. No. 17 at 14.)
24  However, because plaintiff fails to offer an actual theory of how he meets or equals a listing, nor
    cites to any specific record evidence in support thereof, that argument merits no further
25  discussion.  See Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001) (explaining that the claimant
    must at least offer a theory with some supporting evidence that his impairments equal a listed
26  impairment).

2.      Whether the ALJ failed to properly analyze the evidence concerning

plaintiff's alleged mental impairments

Plaintiff next argues that the ALJ "ignored Plaintiff's anxiety/depression disorder

mental impairment in his Step-2 analysis" and failed to follow the special technique for

evaluating mental impairments as required by 20 C.F.R. § 404.1520a. (See e.g. Pl's Mot. for

Summary Judgment, Dkt. No. 17 at 9-10, 14-16.)  This argument is entirely frivolous and again

misstates the record, because plaintiff was never diagnosed with an "anxiety/depression

disorder."

Although Dr. Cox referred plaintiff for a psychological evaluation based on a

"provisional diagnosis" of anxiety, plaintiff's counsel conveniently omits the fact that

psychologist Dr. Nelson subsequently did not confirm this diagnosis and did not feel that any

particular follow-up for mental health problems was necessary.  (AT 276-77.)  Dr. Nelson noted

that plaintiff was not depressed, and was coherent, oriented, had an appropriate affect, and denied

suicidal ideation.  (AT 277.)  Although plaintiff reported restless sleep, this was not attributed to

any specific mental impairment.  (AT 277.)  Additionally, Dr. Cox's initial referral note for the

psychological evaluation also strongly undermines even his "provisional" diagnosis of anxiety:

> Pt on parole after incarceration for a nondrug offense.  He is vague
> about prior counseling.  He *may or may not need it* but it should be
> on record with us that he spoke with mental health and that it was
> available.

(AT 276 [emphasis added].)  Indeed, given the absence of a diagnosis or any assessed mental

health symptoms and limitations, the moderate GAF score assigned by Dr. Nelson seems more

reflective of plaintiff's criminal history.  (AT 276-77.)  Even though plaintiff on reply argues that

his conviction as a sex offender is suggestive of mental impairment and limitation, there is no

record evidence in support of such an assertion.  (AT 229.)  Importantly, plaintiff himself

testified that he never sought mental health treatment and on several occasions expressly denied

having any mental symptoms or limitations.  (AT 55-56, 234, 276-77, 321.)

17

1    Therefore, the ALJ correctly concluded that the record does not support the

2    presence of a severe mental impairment.  (AT 27.)  Plaintiff's counsel's argument to the contrary

3    mischaracterizes the record and is devoid of merit.

4            3.    Whether the ALJ improperly discounted plaintiff's testimony regarding his

5                  symptoms and functional limitations

6            Plaintiff further contends that the ALJ improperly failed to credit plaintiff's

7    testimony concerning his symptoms and functional limitations.  At the hearing, plaintiff testified

8    that his pain level averaged around a 7 out of 10, forcing him to lie down for half an hour three

9    times a day on a good day; he had to lie down most of the day for about three to four days a

10   week; he could only sit or stand for 10-15 minutes at a time; and he had to use a cane two to

11   three times a week.  (AT 47, 53, 61-62.)

12           "Credibility determinations are the province of the ALJ" and are entitled to

13   deference if the ALJ provides sufficient reasoning supported by substantial evidence.  Fair v.

14   Bowen, 885 F.2d 597, 604 (9th Cir. 1989).  A two-step analysis is used to determine whether a

15   claimant's testimony regarding subjective pain or symptoms, and resulting functional limitations,

16   is credible.  First, the claimant "must produce objective medical evidence of an underlying

17   impairment which could reasonably be expected to produce the pain or other symptoms

18   alleged...." Smolen, 80 F.3d at 1281 (citations omitted).  "[T]he claimant need not show that her

19   impairment could reasonably be expected to cause the severity of the symptom she has alleged;

20   she need only show that it could reasonably have caused some degree of the symptom."  Id. at

21   1282.  Second, once this initial showing is made and there is no affirmative evidence of

22   malingering, "the ALJ may reject the claimant's testimony regarding the severity of her

23   symptoms only if he makes specific findings stating clear and convincing reasons for doing so."

24   Id. at 1283-84; see also Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).

25           "General findings are insufficient; rather, the ALJ must identify what testimony is

26   not credible and what evidence undermines the claimant's complaints."  Lester, 81 F.3d at 834;

1   see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  In weighing a claimant's

2   credibility, the ALJ may consider, among other factors, the claimant's reputation for truthfulness;

3   inconsistencies in his statements and testimony, or between his statements or testimony and his

4   conduct; his daily activities; his work record; unexplained or inadequately explained failure to

5   seek treatment or to follow a prescribed course of treatment; and testimony from physicians and

6   third parties concerning the nature, onset, duration, frequency, severity, and effect of the

7   symptoms of which he complains.  See Smolen, 80 F.3d at 1284.  However, the ALJ may not

8   find subjective complaints incredible solely because objective medical evidence does not

9   quantify them.  Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991).

10          As an initial matter, the court notes that the ALJ did not entirely discredit

11  plaintiff's allegations of pain and discomfort.  For example, the ALJ's assessment that plaintiff

12  could only stand 30-45 minutes with change of position was a more favorable limitation than

13  those provided in any of the medical opinions.  (AT 23.)  Nevertheless, to the extent that the ALJ

14  discounted plaintiff's testimony regarding his symptoms and functional limitations, the ALJ

15  provided several specific, clear, and convincing reasons for doing so.

16          The ALJ properly found that the medical evidence failed to support the intensity

17  of plaintiff's symptoms.  (AT 26-27.)  Here, the assessments by consultative examiner Dr.

18  Garfinkel and state agency physicians Drs. Crowhurst and Dann, coupled with the generally

19  unremarkable objective findings of Dr. Cox and plaintiff's other treating sources, provide a

20  proper basis to discount plaintiff's allegations of disabling limitations.  Although subjective

21  complaints may not be found incredible solely because objective medical evidence does not

22  quantify them, the ALJ properly considered the medical evidence as a relevant factor in

23  evaluating the credibility of plaintiff's testimony.

24          Additionally, the ALJ noted, as discussed above, that plaintiff's treatment had

25  been essentially routine and conservative, and that his impairments were generally controlled

26  satisfactorily with medication.  (AT 26-27.)  See Fair v. Bowen, 885 F.2d 597, 604 (9th Cir.

1   1989); Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("We have previously indicated that

2   evidence of conservative treatment is sufficient to discount a claimant's testimony regarding

3   severity of an impairment."); Warre v. Comm'r, 439 F.3d 1001, 1006 (9th Cir. 2006)

4   ("Impairments that can be controlled effectively with medication are not disabling for the

5   purpose of determining eligibility for SSI benefits.")  Although plaintiff apparently sometimes

6   used a cane, it had not been prescribed by his treating physician.  (AT 26.)

7           The ALJ also observed that plaintiff at times failed to follow up on his treating

8   providers' recommendations, which suggested that his symptoms may not have been as serious

9   as he alleged.  (AT 27, 249 [did not get requested laboratory testing and MRI done], 279 [did not

10  get x-ray of lumbar spine as requested], 322 [declined treatment for weight loss].)  Failure to

11  seek or follow treatment is a proper consideration when evaluating credibility.  See Burch v.

12  Barnhart, 400 F.3d 676, 681 (9th Cir. 2005); Smolen, 80 F.3d at 1284.

13          Furthermore, the ALJ found that plaintiff's daily activities undermined his

14  complaints of disabling pain.  (AT 27.)  There is evidence in the record that plaintiff regularly

15  rode his bike despite back pain, engaged in light housework, prepared meals, used public

16  transportation, went shopping, and did light yard work for his mother in law.  (AT 188-89, 209,

17  252, 277, 279, 280, 281, 307, 313.)  Moreover, even if not in themselves dispositive, these

18  activities, in combination with several other valid and independent reasons for discounting

19  plaintiff's testimony, support the ALJ's credibility analysis.

20          In sum, the court finds that the ALJ properly evaluated the medical evidence of

21  plaintiff's physical and mental impairments, properly discounted plaintiff's testimony concerning

22  his symptoms and functional limitations, and properly assessed plaintiff's RFC.  Accordingly,

23  substantial evidence supports the ALJ's decision.

24      C.    Order to Show Cause

25          As outlined above, the briefing submitted by plaintiff's counsel failed to comply

26  with the undersigned's April 6, 2011 scheduling order and also mischaracterized some of the

1  pertinent medical evidence.  Therefore, plaintiff's counsel will be directed to show cause within

2  fourteen (14) days of this order why he should not be required to personally pay monetary

3  sanctions in the amount of $300 for these violations.  Plaintiff's counsel's response shall take the

4  form of a declaration made under penalty of perjury and shall not exceed five (5) pages.

5  V.    CONCLUSION

6         For the foregoing reasons, IT IS HEREBY ORDERED that:

7         1.    Plaintiff's motion for summary judgment (dkt. no. 17) is denied.

8         2.    The Commissioner's cross-motion for summary judgment (dkt. no. 18) is

9  granted.

10        3.    Judgment is entered for the Commissioner.

11        4.    Plaintiff's counsel shall show cause within fourteen (14) days of this order

12              why he should not be required to pay monetary sanctions in the amount of

13              $300 for failure to comply with the court's briefing requirements outlined

14              in the April 6, 2011 scheduling order and for mischaracterizing the record

15              evidence.  Plaintiff's counsel's response shall take the form of a

16              declaration made under penalty of perjury and shall not exceed five (5)

17              pages.

18        IT IS SO ORDERED.

19  DATED:  September 10, 2012

20

21

        KENDALL J. NEWMAN
22      UNITED STATES MAGISTRATE JUDGE

23

24

25

26